Vivian **HOLLAND, Morse W. Holland, Individually and as Representatives of the Estate of Morse Wayne Holland, and Angela Scott, as Next Friend of Xavier Christopher Scott, Plaintiffs,**

v.

**CITY OF HOUSTON, David M. Boling, Individually and in his Official Capacity, and Lucious Carl James, Individually and d/b/a/ Cue Club and Disco, Defendants.**

**Civil Action No. H–96–2951.**

United States District Court, S.D. Texas.

Jan. 7, 1999.

Barry Milton Barnes, Barnes and Turner, Houston, TX, for Vivian Holland, Morse W. Holland, Angela Scott.

Murray Edward Malakoff, City of Houston, Judith D. Sanchez, City of Houston, Legal Dept., Houston, TX, for the City of Houston.

Richard H. Cobb, HPPU, General Counsel, Houston, TX, for David M. Boling.

William Carroll Book, Jr., Tekell Book Matthews and Limmer, Houston, TX, for L.D. Blackwell.

Sandra W. Robinson, Houston, TX, for M. Forte.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court are Defendant David Boling's ("Boling") Motion for Summary Judgment (# 66) and Defendant City of Houston's ("the City") Motion for Summary Judgment (# 90). Boling and the City seek summary judgment on the Plaintiffs' claims under 42 U.S.C. § 1983 and Texas state law. Having reviewed the pending motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the City's motion for summary judgment should be granted and that Boling's motion for summary judgment should be granted in part and denied in part.

I. *Background*

On August 7, 1994, at approximately 1:23 a.m., a shooting occurred in the parking lot of Honey's Cue Club and Disco, also known as Palm's Cue Club and Disco ("Cue Club"), located at 5259 Griggs Road in Houston, Texas. The Cue Club was owned by Defendant Lucious Carl James ("James") and managed by James and his son, Richard Allen James ("Richard"). Approximately one year prior to the shooting, Richard employed Boling and David A. Dunning ("Dunning"), both officers with the Houston Police Department ("HPD"), to provide security for the club on the weekends.

The incident in dispute began when a fight broke out on the dance floor of the Cue Club between Morse Wayne Holland ("Holland"), age twenty, and several unknown patrons. Boling and Dunning, who were working authorized off-duty jobs in full uniform, separated the combatants and escorted them outside. Once outside, fighting erupted once again, and Boling and Dunning attempted to separate the participants. Boling was alerted that one of the men involved in the fight had a gun. From that point on, the parties' versions of the ensuing events differ widely. Boling contends that he proceeded to investigate and, at the south end of the parking lot, some distance from the club, discovered Holland holding a Mossberg 12 gauge pump-type shotgun while facing some of the combatants. According to Boling, although he ordered Holland to drop the weapon, Holland instead turned, assumed an aggressive stance, and aimed the shotgun at Boling. Boling maintains that, in response, he fired his .40 caliber service revolver at Holland to prevent injury to himself and other patrons. Boling asserts that Holland then dropped the shotgun, ran to the opposite side of the parking lot, and fell to the ground. In contrast, the plaintiffs allege that Holland either never held the shotgun or dropped the weapon when Boling instructed him to do so. Under either scenario, the plaintiffs contend that Holland was not armed with a weapon when he was shot by Boling. Holland died of his wounds prior to the arrival of an ambulance.

The plaintiffs—Holland's estate, parents, and son—instituted this action on August 1, 1996, seeking recovery of damages under 42 U.S.C. § 1983 and Texas law. On August 8, 1996, the City removed the case to federal court. The plaintiffs filed an amended complaint on September 16, 1998, asserting a wrongful death and survival action under Texas law, alleging negligence and gross negligence on the part of Boling and the City. The plaintiffs further assert that Boling and the City violated 42 U.S.C. § 1983 by depriving

Holland of clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. They also allege that James violated the Texas Alcoholic Beverage Code by serving alcoholic beverages to Holland because he was a minor and was obviously intoxicated. Although James was served with the lawsuit on August 16, 1996, he has not filed an answer.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which the party believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving party, however, need not negate the elements of the nonmovants' case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir. 1993)); *see Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *petition for cert. filed,* —— U.S. ——, 119 S.Ct. 794, 142 L.Ed.2d 657 (1998) (No. 98–535); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *petition for cert. filed,* —— U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1998) (No. 98–662). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *see Marshall,* 134 F.3d at 321.

Nevertheless, the nonmovants' burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genu-

ine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

## B. *Section 1983 Claims*

 Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law. *See Migra v. Warren City School Dist. Board of Educ.*, 465 U.S. 75, 82, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *McIntosh v. Antonio*, 71 F.3d 29, 33 (1st Cir. 1995). It provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir.1985); *Carbonell v. Louisiana Dep't of Health & Human Resources*, 772 F.2d 185, 188 (5th Cir.1985). To prevail on a § 1983 claim, the plaintiffs must prove that a person acting under the color of state law deprived them of a right secured by the Constitution or laws of the United States.

*See* 42 U.S.C. § 1983; *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Augustine v. Doe*, 740 F.2d 322, 324–25 (5th Cir.1984). Section 1983 complainants must support their claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *See Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995); *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.), *cert. denied*, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir.1986); *Angel v. City of Fairfield*, 793 F.2d 737, 739 (5th Cir.1986); *Elliott v. Perez*, 751 F.2d 1472, 1482 (5th Cir.1985).

 Thus, for the plaintiffs to recover, they must show that the defendants deprived them of a right guaranteed by the Constitution or the laws of the United States. *See Daniels*, 474 U.S. at 329–31, 106 S.Ct. 662; *Baker*, 443 U.S. at 139, 99 S.Ct. 2689; *Thomas v. Sams*, 734 F.2d 185, 190–91 (5th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). The plaintiffs must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference—not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828–29, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels*, 474 U.S. at 328, 106 S.Ct. 662; *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The negligent deprivation of life, liberty, or property is not a constitutional violation. *See Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir.1995); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir.), *cert. denied*, 506 U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992); *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir.1989); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir.1988); *Young*, 775 F.2d at 1353. Moreover, to hold a defendant liable under § 1983, the plaintiffs must adduce facts demonstrating the defendant's participation in the alleged

wrong. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir.1992); *Jacquez*, 801 F.2d at 793.

### 1. *Claim Against Boling*

■ The plaintiffs are suing Boling both individually and in his official capacity as a City of Houston police officer. To the extent he is sued in his official capacity, Boling's liability is coextensive with that of the City. Official-capacity lawsuits are typically an alternative means of pleading an action against the governmental entity involved. *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). A suit against an official in his official capacity is not a suit against the official personally, but rather is a suit against the official's office. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir.1996). As such, it is no different than a suit against the City itself. *See Will*, 491 U.S. at 71, 109 S.Ct. 2304 (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Monell*, 436 U.S. at 691 n. 55, 98 S.Ct. 2018); *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir.1996).

■ The United States Supreme Court has observed:

As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Graham*, 473 U.S. at 166, 105 S.Ct. 3099 (citations omitted). Hence, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell* ... local government units can be sued directly for damages and injunctive or declaratory relief." *Id.* at 167 n. 14, 105 S.Ct. 3099; *see Monell*, 436 U.S. at 690, 98 S.Ct. 2018. Because "the Eleventh Amendment does not apply to 'counties and similar municipal corporations,'" the City may be subject to claims for monetary and injunctive relief under § 1983. *Crane v. Texas*, 759 F.2d 412, 415 (5th Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 150 n. 34, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977))); *see Van Ooteghem v. Gray*, 584 F.Supp. 897, 898 (S.D.Tex.1984), *aff'd as modified*, 774 F.2d 1332 (5th Cir.1985) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 765 n. 1 (5th Cir.1984), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)). Therefore, the plaintiffs' action against Boling in his official capacity is merely redundant and is of no independent legal significance.

#### a. *Excessive Force Claim*

■ The plaintiffs claim that Boling used excessive force against Holland in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments. The Supreme Court has made clear that "all claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than a substantive due process approach." *Graham*, 490 U.S. at 395, 109 S.Ct. 1865; *see Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir.1998); *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994); *Mouille v. City of Live Oak*, 918 F.2d 548, 550 (5th Cir.1990); *Hay v. City*

690

*of Irving*, 893 F.2d 796, 798 (5th Cir.1990). "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,'" as invoked by the plaintiffs in their Fifth and Fourteenth Amendment claims, must be the guide for analysis. *Graham*, 490 U.S. at 395, 109 S.Ct. 1865. "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (citation omitted). Thus, a deadly force complaint under § 1983 brought by a free citizen must be analyzed according to Fourth Amendment standards. *See Stroik v. Ponseti*, 35 F.3d 155, 157 (5th Cir.1994), *cert. denied*, 514 U.S. 1064, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995); *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991); *Drain v. Galveston County*, 999 F.Supp. 929, 933 (S.D.Tex.1998).

■ To prevail on a claim for the use of excessive force under the Fourth Amendment, a § 1983 plaintiff is required to prove that he: "(1) suffered some injury, which (2) resulted from force that was clearly excessive to the need for force, (3) the excessiveness of which was objectively unreasonable." *Heitschmidt v. City of Houston*, 161 F.3d 834, ——, 1998 WL 809036, at *6 (5th Cir.1998); *accord Carter v. Fenner*, 136 F.3d 1000, 1010 (5th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 591, 142 L.Ed.2d 534 (1998); *Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir.1996); *Fontenot v. Cormier*, 56 F.3d 669, 675 (5th Cir.1995); *Harper*, 21 F.3d at 600; *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir.), *cert. denied*, 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); *Knight v. Caldwell*, 970 F.2d 1430, 1432 (5th Cir. 1992), *cert. denied*, 507 U.S. 926, 113 S.Ct. 1298, 122 L.Ed.2d 688 (1993). In 1992, the Supreme Court rejected the Fifth Circuit's previous requirement that a "significant injury" be shown to establish a viable excessive force claim. *See Hudson v. McMillan*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Thus, the absence of serious injury, while relevant to the inquiry, does not preclude relief. *See id.* at 7, 112 S.Ct. 995; *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir.1998); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). Nevertheless, the injury must be more than *de minimis*. *See Hudson*, 503 U.S. at 10, 112 S.Ct. 995; · *Baldwin*, 137 F.3d at 839; *Siglar*, 112 F.3d at 193; *Knight*, 970 F.2d at 1432–33. If any of the three elements fails, the plaintiff's claim of excessive force will not succeed. *See Huong v. City of Port Arthur*, 961 F.Supp. 1003, 1006 (E.D.Tex.1997).

■ "As in other Fourth Amendment contexts, ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865 (citing *Scott v. United States*, 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)); *accord Ikerd*, 101 F.3d at 430. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865 (citing *Scott*, 436 U.S. at 138, 98 S.Ct. 1717). In making a determination of objective reasonableness, the court must look at the "totality of the circumstances." *See Stroik*, 35 F.3d at 158. "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Bell v. Wolfish*, 441 U.S. 520, 550, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citing *Garner*, 471 U.S. at 8–9, 105 S.Ct. 1694)).

"In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that force." *Ikerd*, 101 F.3d at 434. "[A] constitutional violation does not occur every time an officer touches someone." *Id.* " 'Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). In addition, the amount of force that is constitutionally permissible must be judged by the context in which the force is deployed. *See Baldwin*, 137 F.3d at 840; *Ikerd*, 101 F.3d at 434. As the Fifth Circuit observed in *Ikerd*:

> For example, a convicted prisoner clearly does not have a cognizable eighth amendment claim every time he or she is pushed or shoved. Similarly, even in the fourth amendment context, a certain amount of force is obviously reasonable when a police officer arrests a dangerous, fleeing suspect. On the other hand, in the context of custodial interrogation, the use of nearly any amount of force may result in a constitutional violation when a suspect 'poses no threat to [the officers'] safety or that of others, and [the suspect] does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified.
>
> Similarly, we believe that the amount of injury required to prevail in an excessive force action depends on the context in which the injury occurs. Nonetheless, this circuit currently requires a

plaintiff to have 'suffered at least some injury.' As the Supreme Court has recognized, however, 'the extent of injury suffered by a [plaintiff] is one factor that may suggest whether the use of force' was excessive 'in a particular situation.' Therefore, the amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.

*Id.* at 434–35 (citations omitted). The determination of whether a particular use of force was reasonable under the Fourth Amendment "must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865; *accord Carter*, 136 F.3d at 1010. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. As the Supreme Court explained in *County of Sacramento v. Lewis*:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to made 'in haste, under pressure, and frequently without the luxury of a second chance.'

523 U.S. 833, 118 S.Ct. 1708 at 1720, 140 L.Ed.2d 1043 (1998) (quoting *Whitley*, 475 U.S. at 320, 106 S.Ct. 1078).

When deadly force is involved, the Supreme Court has held that officers cannot resort to deadly force unless they "have probable cause . . . to believe that the suspect [has committed a felony and]

poses a threat to the safety of the officers or a danger to the community if left at large." *Garner*, 471 U.S. at 6, 105 S.Ct. 1694; *see Fraire*, 957 F.2d at 1278. Clearly, "[a] police officer may not seize an unarmed nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11, 105 S.Ct. 1694. Nonetheless, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.; Fraire*, 957 F.2d at 1280. "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694. Therefore, an officer is not prevented "from using deadly force in self-defense when the officer has probable cause to believe that the suspect poses a threat of serious physical injury or death to the officer." *Fraire*, 957 F.2d at 1280.

▮ Here, it is undisputed that Boling used deadly force and that Holland died as a result of three gunshot wounds he inflicted—one to the abdomen, one to the back, and one to the arm. The plaintiffs' allegations that Boling was negligent in seven specified instances are not actionable under § 1983, as liability for a deprivation of civil rights requires a showing that the defendant's actions were intentional or due to deliberate indifference. *See Farmer*, 511 U.S. at 828–29, 114 S.Ct. 1970; *Davidson*, 474 U.S. at 348, 106 S.Ct. 668; *Daniels*, 474 U.S. at 328, 106 S.Ct. 662; *Gamble*, 429 U.S. at 105, 97 S.Ct. 285; *Young*, 775 F.2d at 1353. Thus, a § 1983 plaintiff has "no constitutional right to be protected from [a] merely negligent conclusion" concerning his involvement in criminal activity. *Campbell*, 43 F.3d at 977. Nevertheless, the plaintiffs have satisfied the first element and part of the second element of a claim for excessive force under § 1983. Questions of fact exist, however, as to whether the force applied by Boling was clearly excessive to the need and objectively unreasonable.

Specifically, there is conflicting evidence concerning whether Holland was holding a gun when he was shot by Boling. In his statement to the HPD on the night of the shooting, Boling stated:

> After I got outside the club a second fight started down the sidewalk and as I attempted to pull the males apart it quickly escalated to approximately 4 or 5 persons. Simultaneously, someone started yelling "he's going to get a gun," and I also heard someone yelling "he's got a gun."

> At this time I, D.M. Boling left the group that was fighting and started looking for someone in possession of a weapon. I had positioned myself behind some parked cars and close to the Griggs road side of the parking lot. I observed a very large black male with a black shotgun facing the disturbance.

> I at this time yelled at him very loud to drop the gun. The area was well luminated [sic] and I was in uniform. He was looking directly at me after I gave that order. After I ordered him to drop the gun, he turned directly at me and raised the weapon to hip level. He then took an aggressive firing stance. At this point I was in immediate danger of serious bodily injury and death. I started to fire my weapon. He then went into a semi crouch position and was still pointing the shotgun at me. I continued firing my weapon as long as he, the suspect, remained in the firing position. After my weapon was empty he turned with the weapon still in hand. He then began to run from behind the black Ford, which he was standing behind. He then ran from the back rear passenger side to the drivers side of the Ford. He then slipped and dropped his weapon, which fell partially into the street near the curb. He continued to run to

the front of the Ford. I was unable to observe him any at this time, but I was able to see the weapon. I ran to the location to secure the weapon as there were a number of persons in the immediate area. My partner, D.A. Dunning, ran to the location of the suspect and secured the suspect. We immediately contacted H.F.D. for medical treatment of the suspect and notified all appropriate HPD personnel.

While Boling asserts that Holland had a shotgun in his hand when he shot him, the plaintiffs disagree, pointing to the deposition testimony of Malcolm Cerf ("Cerf") and his sister, Shackquelyn Cerf ("Shackquelyn"). Neither Cerf nor Shackquelyn gave a statement to the police on the night of the shooting, but approximately four years later, each testified that Holland was unarmed when shot by Boling. Cerf testified:

Q: When did you first see the officer who did the shooting in the parking lot?

A: When the guy [Holland], like, ran over by his car, that's when I noticed the officer was standing on the side here.

Q: So when the guy ran over by the car, you saw the officer on the side of you?

A: Yes, sir, right·over in like here (indicating).

\* \* \* \* \* \*

Q: Okay. How close was the officer standing to you?

A: About like an arm distance probably.

Q: So the officer was standing an arm's length away from you?

A: Yes, sort of.

Q: Okay. And so when you heard the officer's gun go off, okay, did you see the officer point the gun to the boy?

À: Yes, he had it like that (indicating).

Q: Okay. Did you see the gun go off?

A: I didn't see it, but I heard it.

Q: Okay. How do you know it was the officer's gun?

A: That's the only one that, you know, know that had a gun, and then somebody in the crowd hollered, "He got a gun." And that's when the officer, like, pulled his, and then they hollered and told him get down and waited so long and that's when I heard a gunshot.

Q: Okay. The officer told the other person, the other boy to get down?

A: Yes, sir.

Q: And then there was a pause?

A: Yes, sir.

Q: And then you heard gunshots?

A: Yes. sir.

Q: What were you doing when you heard gunshots?

A: I was ducking.

\* \* \* \* \* \*

Q: Were you still able to see what was going on?

A: Yes, sir.

\* \* \* \* \* \*

Q: When the police officer yelled at the boy, did you see the boy raise a gun and point it at the police officer?

A: No, sir, not by my knowledge.

Q: Did you see him raise a shotgun and point it at the police officer?

A: No, sir.

Q: Did you duck because a gun was pointing in your direction?

A: No, sir.

Q: Is it fair to say that if you were arm's length away from the police officer and a shotgun was pointed at the police officer, that you would have noticed that shotgun?

A: If he pointed the gun at the police officer?

Q: Yes.

A: Yes, sir, I would have been able to.

Q: After the police officer yelled "get down" and there was pause and you heard the shot, what happened then? What did you see then?

A: Just like the guy laying on the floor.

\* \* \* \* \* \*

Q: After he was lying on the ground, did you see a gun?

A: No, sir, not by my knowledge.

Shackquelyn, who broke off a two-year relationship with Holland's cousin, Issac Holland ("Isaac"), the day after the shooting, offered testimony similar to her brother's, stating:

Q: So Officer Boling was watching Morse Holland approach his car?

A: Yes, sir.

Q: And you were able to observe what Officer Boiling was doing and what Morse Holland was doing at the same time?

A: Yes, sir.

Q: After Morse Holland got to his car, in your own words, tell us what happened.

A: That's when Officer Boling told him to stop and turn around. Well, Morse had his left-hand up and his right hand down by his side; but you could see the palm of his right hand. And when we turned around, that's when somebody yelled he has a gun, and Officer Boling and the other officer shot. So didn't nobody never see a gun with Morse. We don't know who yelled that or what they was yelling that for.

\* \* \* \* \* \*

Q: Did you see a gun?

A: No, sir.

Q: Did you see Morse Holland turn and aim a gun at Officer Boling?

A: No, sir.

Q: Did you see Morse Holland turn and aim a shotgun at Officer Boling?

A: No, sir.

Q: Did you see Morse Holland turn, aim a shotgun, holding the shotgun with two hands towards Officer Boling?

A: No, sir.

Q: Did you see Morse Holland throw a shotgun away?

A: No, sir.

Q: Did you see anybody else out there with a shotgun?

A: No sir. Once they started shooting him, everybody's attention dwelled on the guy.

Q: How many commands, as far as you can tell, as far as you can recall, how many commands did Officer Boling give Morse Wayne Holland?

A: Three.

Q: Can you recall what he said?

A: The first one was, "Stop." The second was to turn around. And the third one was to walk away from the car.

Q: Did Morse Wayne Holland obey those commands?

A: Yes, sir.

The plaintiffs also provide the affidavit of Isaac, dated August 23, 1998, who recanted his previous statement given to HPD investigators on August 7, 1994, that he saw Holland "with a shotgun in his hands" on the night of the shooting. Although Isaac described the shotgun in some detail and gave information about its ownership and location in his prior statement, in his more recent affidavit, Isaac states that he "did not personally see Holland with a gun or weapon on that night." Thus, Cerf's and Shackquelyn's accounts of the incident and Isaac's affidavit contradict Boling's assertion that Holland was armed and posed a danger when he was shot. In addition, the HPD Offense Report reveals that the Latent Fingerprint Laboratory did not find Holland's fingerprints on the Mossberg shotgun he allegedly pointed at Boling. The report states, "Examination of [the shotgun] revealed no suitable latent print(s) containing sufficient characteristics to effect an identification."

Therefore, it cannot be determined from the record before the court whether the force applied by Boling was clearly excessive and objectively unreasonable. Given these questions of fact, in the absence of a viable affirmative defense, the plaintiffs'

claims that Boling used excessive force are unsuitable for summary judgment and must be presented to the jury.

### b. *Qualified Immunity*

■ Boling asserts that he has qualified immunity from the plaintiffs' § 1983 claims. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Tamez v. City of San Marcos,* 118 F.3d 1085, 1091 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1073, 140 L.Ed.2d 132 (1998); *Hart,* 127 F.3d at 441. "An official acts within his discretionary authority when he performs nonministerial acts within the boundaries of his official capacity." *Tamez,* 118 F.3d at 1091–92; *Cronen v. Texas Dept. of Human Servs.,* 977 F.2d 934, 939 (5th Cir.1992). In this situation, Boling did not act pursuant to specific orders spelled out in minute detail beforehand. *See Tamez,* 118 F.3d at 1092. Instead, "[h]is response required quick, but careful deliberation and the exercise of his judgment." *Id.* Thus, his actions fell "within the realm of discretionary decisions police officers commonly make." *Id.*

> The qualified or 'good faith' immunity doctrine was established to reconcile two competing interests. One interest is the compensation of persons whose federally protected rights have been violated. Opposing this is the fear that personal liability will inhibit public officials in the discharge of their duties. Qualified immunity has therefore been recognized to protect 'all but the plainly incompetent or those who knowingly violate the law.'

*Johnston v. City of Houston,* 14 F.3d 1056, 1059 (5th Cir.1994) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ Qualified immunity is available to defendant officials in suits arising under § 1983 and, because it is "an affirmative defense, the defendant must both plead and establish his entitlement to immunity." *Tamez,* 118 F.3d at 1091; *see Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Cronen,* 977 F.2d at 939. It is an immunity from suit, extending beyond a defense to liability to include all aspects of civil litigation, including discovery. *See Heitschmidt,* 161 F.3d 834, 840; *Jacquez,* 801 F.2d at 791; *see also Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

■ "Whether a government official is entitled to qualified immunity 'generally turns on the "objective reasonableness of the action" assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Johnston,* 14 F.3d at 1059 (quoting *Texas Faculty Ass'n v. University of Tex. at Dallas,* 946 F.2d 379, 389 (5th Cir.1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))). In considering a claim of qualified immunity, the court must make a two-step inquiry:

> First, the court must determine whether the plaintiff has alleged a violation of a clearly established constitutional right. If the plaintiff fails this step, the defendant is entitled to qualified immunity. If she is successful, the issue becomes the objective legal reasonableness of the defendant's conduct under the circumstances.

*Baker,* 75 F.3d at 198 (citations and internal quotations omitted); *see Nerren v. Livingston Police Dep't,* 86 F.3d 469, 473 (5th Cir.1996); *Harper,* 21 F.3d at 600; *Rankin v. Klevenhagen,* 5 F.3d 103, 105 (5th Cir.1993). A defendant "is entitled to qualified immunity unless he violated a constitutional right that was clearly established at the time of his conduct." *Black-*

well v. Barton, 34 F.3d 298, 302–03 (5th Cir.1994); see Harper, 21 F.3d at 600.

When determining whether qualified immunity is available, the actions of a reasonably competent official are assessed in light of the legal rules that were clearly established at the time the action was taken. See Siegert, 500 U.S. at 231, 111 S.Ct. 1789; Anderson, 483 U.S. at 638, 483 U.S. 635; Mitchell, 472 U.S. at 530, 105 S.Ct. 2806; Harlow, 457 U.S. at 818, 102 S.Ct. 2727; Petta v. Rivera, 143 F.3d 895, 899–900 (5th Cir.1998); Gutierrez, 139 F.3d at 445; Tamez, 118 F.3d at 1095 n. 5; Dunn v. Denk, 79 F.3d 401, 403 (5th Cir. 1996); Bennett v. City of Grand Prairie, 883 F.2d 400, 408 (5th Cir.1989). A legal right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. See Anderson, 483 U.S. at 640, 107 S.Ct. 3034; Johnston, 14 F.3d at 1059; Bennett, 883 F.2d at 408. In 1994, Holland had a clearly established constitutional right to be free from the use of excessive force by a police officer in the course of an arrest, investigatory stop, or other seizure. See, e.g., Graham, 490 U.S. at 394–95, 109 S.Ct. 1865; Harper, 21 F.3d at 600.

" 'If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity.' " Blackwell, 34 F.3d at 303 (quoting Pfannstiel v. City of Marion, 918 F.2d 1178, 1183 (5th Cir.1990)); accord Johnston, 14 F.3d at 1059; see Malley, 475 U.S. at 341, 106 S.Ct. 1092; Cantu v. Rocha, 77 F.3d 795, 806 (5th Cir.1996). The Fifth Circuit has observed, for example, in the context of a Fourth Amendment claim alleging wrongful arrest:

In suits alleging illegal arrest, the qualified immunity determination turns on whether " 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the ... officer [ ] possessed.' Even law enforcement officials who 'reasonably but mistakenly believe

that probable cause is present' are entitled to immunity."

Babb v. Dorman, 33 F.3d 472, 477 (5th Cir.1994) (quoting Hunter v. Bryant, 502 U.S. 224, 226, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)); see Baker, 75 F.3d at 198. Similarly, if a suspect's movements give an officer reasonable cause to believe that there is a threat of serious physical harm, the use of deadly force is not a constitutional violation. See Young, 775 F.2d at 1353. "[N]o right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Id.; Kellough v. Bertrand, 22 F.Supp.2d 602, 610–11 (S.D.Tex.1998). Thus, an "officer could make a constitutionally reasonable judgment based on a factual misperception." Snyder v. Trepagnier, 142 F.3d 791, 800 (5th Cir.1998), petition for cert. filed, —— U.S. ——, 119 S.Ct. 863, 142 L.Ed.2d 716 (1999). In other words, if Boling's conduct was objectively reasonable, he may invoke qualified immunity, even if the conduct infringed upon Holland's constitutional rights. See Gutierrez, 139 F.3d at 445; Fraire, 957 F.2d at 1273; Pfannstiel, 918 F.2d at 1183.

Once an official asserts his entitlement to qualified immunity in a properly supported motion for summary judgment, the plaintiff bears the burden of coming forward with sufficient summary judgment evidence to sustain a determination that the official's actions violated clearly established federal law. See Blackwell, 34 F.3d at 301; Salas v. Carpenter, 980 F.2d 299, 304, 306 (5th Cir.), cert. denied, 506 U.S. 973 (1992); Bennett, 883 F.2d at 408; United States v. Burzynski Cancer Research Inst., 819 F.2d 1301, 1310 (5th Cir. 1987), cert. denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988); Saldana v. Garza, 684 F.2d 1159, 1163 (5th Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). Hence, the plaintiffs must show that Boling knew or reasonably should have known that the actions he was taking within his sphere of

official responsibility would violate Holland's constitutional rights. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Schultea,* 47 F.3d at 1431–32.

In this instance, there is conflicting evidence as to whether Holland was armed and posed a danger when he was shot or whether Boling could have reasonably believed him to have been armed and dangerous. There are also conflicting accounts about the commands Boling gave Holland and whether he complied with the commands. As a consequence, it cannot be determined on the present state of the record whether Boling's actions were objectively reasonable under the circumstances. Thus, due to the underlying factual dispute, it cannot be ascertained at this juncture whether Boling is entitled to qualified immunity. *See Baker,* 75 F.3d at 198. Therefore, the plaintiffs' claim of excessive force as well as Boling's assertion of qualified immunity may proceed to trial.

### 2. *Claim Against the City*

When the claim is one of excessive force, the key to recovering against a municipality under § 1983 is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom. *See Flores v. Cameron County,* 92 F.3d 258, 263 (5th Cir.1996); *Campbell,* 43 F.3d at 977. The United States Supreme Court has expressly held that municipalities may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see Languirand v. Hayden,* 717 F.2d 220, 223 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). A municipality may also be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the

body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *see also Languirand,* 717 F.2d at 223. The Fifth Circuit has defined official policy or custom as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir.1992) (quoting *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)); *accord Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1304 (5th Cir.1995), *cert. denied,* 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

The Supreme Court has identified two types of "policies" under which a municipality may be held liable. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). One type of "policy" is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time. *See id.* Another type of "policy" exists when a municipality takes a course of action tailored to a specific situation and not intended to control decisions in later situations. *See id.* at 481, 106 S.Ct. 1292. Under this second type of "policy," a municipality can be liable only if the decision to adopt that particular course of action is properly made by that government's authorized de-

698

cisionmakers. *See id.* Such "authorized decisionmakers" are defined to be officials " 'whose acts or edicts may fairly be said to represent official policy' " and whose decisions may therefore give rise to municipal liability under § 1983. *Id.* at 480, 106 S.Ct. 1292 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). State law determines whether a particular individual is a final decisionmaker of a governmental entity with respect to a certain sphere of activity. *See Bennett v. Pippin,* 74 F.3d 578, 586 (5th Cir.), *cert. denied,* 519 U.S. 817, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996) (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Doe v. Rains County Indep. Sch. Dist.,* 66 F.3d 1402, 1407 (5th Cir.1995)). The Fifth Circuit has held that, under *Monell,* when a final policymaker makes a decision, and that decision is within the sphere of the policymaker's final authority, " 'the existence of a well-established, officially-adopted policy will not insulate the municipality from liability.' " *Bennett,* 74 F.3d at 586 (quoting *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 754 (5th Cir.1993)).

 "If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir.1984). Consistent with the commonly understood meaning of custom, proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy. *See Fraire,* 957 F.2d at 1278 (citing *Rodriguez v. Avita,* 871 F.2d 552, 554 (5th Cir.), *cert. denied,* 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir. 1987)); *Thompson v. City of Los Angeles,*

885 F.2d 1439, 1443–44 (9th Cir.1989). " 'Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy' as required for municipal section 1983 liability." *Campbell,* 43 F.3d at 977 (quoting *Bennett,* 728 F.2d at 768 n. 3). To demonstrate a municipal policy or custom under § 1983, a plaintiff must at least show:

> a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.

*Fraire,* 957 F.2d at 1278 (citing *Languirand,* 717 F.2d at 227–228). Only if the plaintiff shows that his injury resulted from a " 'permanent and well settled' " practice may liability attach for injury resulting from a local government custom. *See Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

 Moreover, a city does not incur liability under § 1983 unless there exists "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir.1995); *Burns v. City of Galveston,* 905 F.2d 100, 102 (5th Cir.1990). Specifically, "the plaintiff must initially allege that an official policy or custom 'was a cause in fact of the deprivation of rights inflicted.' " *Spiller v. City of Texas City,* 130 F.3d 162, 167 (5th Cir.1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994)). Nevertheless, "[t]his connection must be more than a mere 'but for' coupling between cause and effect." *Fraire,* 957 F.2d at 1281 (citing *City of Canton,* 489 U.S. at 386, 109 S.Ct. 1197; *Tuttle,* 471 U.S. at 823, 105 S.Ct. 2427). The plaintiff must also establish that a government policy or custom was the proximate cause of the injuries sustained. *See*

*Huffman v. County of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir.1998); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997); *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.1996); *Horn by Parks v. Madison County Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir.), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990); *Doe v. District of Columbia*, 701 F.2d 948, 953 (D.C.Cir. 1983); *Rheuark v. Shaw*, 628 F.2d 297, 305 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981); *Daniels v. Gilbreath*, 668 F.2d 477, 480 (10th Cir.1982). "Pointing to a municipal policy action or inaction as a 'but for' cause is not enough to prove a causal connection under *Monell.* Rather, the policy must be the proximate cause of the section 1983 injury." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir.1996), *cert. denied*, 519 U.S. 1111, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997) (citing *Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir.1986)).

In addition, the "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997). As the Supreme Court explained:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 117 S.Ct. at 1388; *see also Spiller*, 130 F.3d at 167 (quoting *Meadowbriar Home For Children, Inc. v. Gunn*, 81 F.3d

521, 533 (5th Cir.1996)). "Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Brown*, 117 S.Ct. at 1394. Thus, plaintiffs seeking to recover against a municipality under § 1983 "must first prove a direct causal link between the municipal policy and the constitutional deprivation; they then must establish that the city consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens." *Snyder*, 142 F.3d at 795–96 (citing *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 117 S.Ct. at 1391.

 Furthermore, a municipality may not be held liable for the acts of its employees under a theory of *respondeat superior. See Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Flores*, 92 F.3d at 263; *Piotrowski*, 51 F.3d at 517; *Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir.1993); *Williams v. Luna*, 909 F.2d 121, 123 (5th Cir.1990); *Rodriguez*, 871 F.2d at 554; *Hickman v. Lively*, 897 F.Supp. 955, 958 (S.D.Tex.1995). "Municipalities are not vicariously liable for the actions of their employees under § 1983. Municipal liability inures only when the execution of a local government's policy or custom causes the injury." *Baker*, 75 F.3d at 200. In order to hold a municipality liable for the acts of a nonpolicymaking employee, the plaintiff must allege and prove that: "(1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; and (4) the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children, Inc.*, 81 F.3d at 532–33 (citing *Palmer*, 810 F.2d at 516). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an em-

ployee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown,* 117 S.Ct. at 1389 (citing *City of Canton,* 489 U.S. at 391–92, 109 S.Ct. 1197). "These requirements must not be diluted for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.' " *Snyder,* 142 F.3d at 796 (quoting *Brown,* 117 S.Ct. at 1394).

### a. *Excessive Force*

■ In the case at bar, the plaintiffs contend that Boling used excessive force while working as a security guard at the Cue Club. Once the fight began, however, Boling ceased being an employee or independent contractor of the Cue Club and instantly became an on-duty HPD officer. The HPD Rules Manual provides:

2.7 *Officers Always Subject to Duty*

Officers shall at all times respond to the lawful orders of supervisors and to the call of citizens in need of assistance. The fact that they may be technically off-duty shall not relieve them from the responsibility of taking prompt and proper police action.

An off-duty peace officer who observes a crime in progress immediately becomes an on-duty officer. *See Laughlin v. Olszewski,* 102 F.3d 190, 192 n. 1 (5th Cir.1996); *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 754 (Tex.App.—Corpus Christi 1998, writ denied); *Wallace v. Moberly,* 947 S.W.2d 273, 277 (Tex.App.—Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.,* 883 S.W.2d 374, 377 (Tex.App.—Dallas 1994, no writ). A peace officer is not relieved of his duty to prevent crime when he witnesses an illegal act simply because he is off-duty. *See Blackwell v. Harris County,* 909 S.W.2d 135, 139 (Tex.App.—Houston [14th Dist.] 1995, writ denied) (citing *Moore v. State,* 562 S.W.2d 484, 486 (Tex.Crim.App.1978)).

Hence, because the plaintiffs' claims stem from the "actions of [its] employees," liability can attach to the City only if those actions involved "the execution of a local government's policy or custom ...." *Baker,* 75 F.3d at 200 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); *see Flores,* 92 F.3d at 263.

■ In this situation, the plaintiffs have failed to adduce sufficient evidence demonstrating a policy or custom of the City authorizing or condoning the use of excessive force. First, it is undisputed that the official policy of the City, as set forth in the Rules Manual of the HPD, dated January 1988, expressly prohibits the use of excessive force:

4.22 *Use of Force*

Officers shall use only that amount of force necessary to accomplish their police mission. The use of excessive force is strictly forbidden.

In addition, under the HPD Rules Manual, officers are required to obey all laws, conduct themselves properly whether on-duty or off-duty, follow established procedures in carrying out their duties, at all times use sound judgment, and respect the rights of individuals. *See* HPD Rules Manual ¶¶ 1.2, 2.3, 2.5. Moreover, the HPD has a comprehensive policy concerning the use of deadly force as well as extensive rules regarding the use of firearms. HPD General Order No. 600–17, issued February 15, 1987, mandates:

*POLICY*

The Houston Police Department places its highest value on the life and safety of its officers and the public. The department's policies, rules and procedures are designed to ensure that this value guides police officers' use of firearms.

The citizens of Houston have vested in their police officers the power to carry and use firearms in the exercise of their service to society. This power is based on trust and, therefore, must be balanced by a system of accountability.

The serious consequences of the use of firearms by police officers necessitate the specification of limits for officers' discretion; there is often no appeal from an officer's decision to use a firearm. Therefore it is imperative that every effort be made to ensure that such use is not only legally warranted but also rational and humane.

The basic responsibility of police officers to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Police officers are equipped with firearms as a means of last resort to protect themselves and others from the immediate threat of death or serious bodily injury. Even though all officers must be prepared to use their firearms when necessary, the utmost restraint must be exercised in their use. Consequently, no officer will be disciplined for discharging a firearm in self-defense or in defense of another when faced with a situation that immediately threatens life or serious bodily injury. Just as important, no officer will be disciplined for not discharging a firearm if that discharge might threaten the life or safety of an innocent person, or if the discharge is not clearly warranted by the policy and rules of the department.

Above all, this department values the safety of its employees and the public. Likewise it believes that police officers should use firearms with a high degree of restraint. Officers' use of firearms, therefore, shall never be considered routine and is permissible only in defense of life and then only after all alternative means have been exhausted.

*RULES*

The policy stated above is the basis of the following set of rules that have been designed to guide officers in all cases involving the use of firearms:

Rule 1: Police officers shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury.

Rule 2: Police officers shall discharge their firearms only when doing so will not endanger innocent persons.

Rule 3: Police officers shall not discharge their firearms to threaten or subdue persons whose actions are destructive to property or injurious to themselves but which do not represent an imminent threat of death or serious bodily injury to the officer or others.

Rule 4: Police officers shall not discharge their firearms to subdue an escaping suspect who presents no imminent threat of death or serious bodily injury.

Rule 5: Police officers shall not discharge their weapons at a moving vehicle unless it is absolutely necessary to do so to protect against an imminent threat to the life of the officer or others.

Rule 6: Police officers when confronting an oncoming vehicle shall attempt to move out of the path, if possible, rather than discharge their firearms at the oncoming vehicle.

Rule 7: Police officers shall not intentionally place themselves in the path of an oncoming vehicle and attempt to disable the vehicle by discharging their firearms.

Rule 8: Police officers shall not discharge their firearms at a fleeing vehicle or its driver.

Rule 9: Police officers shall not fire warning shots.

Rule 10: Police officers shall not draw or display their firearms unless there is a threat or probable cause to believe there is a threat to life, or for inspection.

The plaintiffs have presented no controverting evidence suggesting that the City has an official policy authorizing the use of excessive force while a police officer is

either on-duty or off-duty. Similarly, the plaintiffs have offered no evidence that it is the custom of HPD officers to use excessive force either on-duty or off-duty. The plaintiffs have "presented no evidence . . . that excessive use of force by [Houston's] police officers is so customary as to indicate the existence of an unarticulated municipal policy authorized or encouraging such use." *Berry v. McLemore,* 670 F.2d 30, 32 (5th Cir.1982).

The City cannot be held liable for the acts or omissions of its employees in the absence of a direct causal relationship between a municipal policy or custom and the injury at issue. *See Brown,* 117 S.Ct. at 1388; *City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197; *Spiller,* 130 F.3d at 167; *Meadowbriar Home For Children, Inc.,* 81 F.3d at 533; *Piotrowski,* 51 F.3d at 517. In an attempt to meet this burden, the plaintiffs contend that the City deprived Holland of his constitutional rights through its deliberate conduct in enacting certain official policies of the HPD. The plaintiffs focus on the City's policy allowing off-duty police officers to act as uniformed security officers for night clubs, which, according to the plaintiffs, creates a conflict of interest between the officer's desire for extra income and his duty to report adverse information about the employment site. In support of their position, the plaintiffs offer the report, affidavit, and deposition testimony of James Fyfe ("Fyfe"), a witness designated by the plaintiffs as an expert in the field of law enforcement. Fyfe opines in his report:

> The Houston Police Department committed a gross violation of generally accepted police custom and practice in permitting Officer Boling to work as a uniformed security officer at Honey's Cue Club and Disco. This violation was a direct and proximate cause of the unjustifiable and unnecessary death of Mr. Holland.
>
> As a matter of policy and even law, many U.S. police departments do not allow their officers to work either as security guards or in premises that sell alcoholic beverages.

\* \* \* \* \* \*

> Even though a pinched, black letter reading of [General Order 300–14] did not prohibit officer Boling and his colleague, Officer [D]unning, from working at Honey's Cue Club and Disco, it is my opinion to a high degree of professional certainty that any reasonable and competent police administrator would have interpreted this policy as prohibiting such employment.

Fyfe admitted at deposition, however, that Boling's employment history contained no indication that "he was violence prone or anything like that." In fact, Fyfe "did not opine on any deficiencies with him at all." In addition, the plaintiffs have adduced no evidence of similar incidents involving HPD officers working as uniformed security guards at other establishments serving alcoholic beverages, and Fyfe admitted that he knew of no such incidents. Moreover, while Fyfe testified that in some cities, police officers are not permitted to have extra-duty jobs at premises selling alcoholic beverages, he attributed this to actual or potential corruption, not a concern about the use of excessive force. Fyfe conceded, however, that he knew of no such corruption occurring in the HPD and that there was no indication that the HPD was aware of any potential *conflicts of interest arising from its extra employment policy.* Additionally, although Fyfe criticized Boling for not preventing the sale of alcohol to Holland, who was two weeks away from his twenty-first birthday, he admitted that Boling could have believed him to be older and it would not necessarily have been obvious that a person of Holland's size, with a blood alcohol level of .17, was intoxicated.

The official policy of the City, as set forth in the General Order No. 300–14 of the HPD, issued May 9, 1991, allows for the secondary employment of police officers under certain circumstances:

## PURPOSE

The Houston Police Department allows officers to engage in extra employment as long as such employment does not interfere in any way with the performance of their duties and responsibilities as police officers and as long as such extra employment does not involve the officers in any conflict of interest between employment as Houston police officers and the extra employment. It is the purpose of this General Order to set forth guidelines, conditions and restrictions relating to extra employment.

\*　　\*　　\*　　\*　　\*　　\*

## CIRCUMSTANCES PROHIBITING EXTRA EMPLOYMENT

No extra employment will be worked or authorized if any of the following are true:

\*　　\*　　\*　　\*　　\*　　\*

c. The business or location is not suitable for extra employment or a potential conflict of interest exists.

\*　　\*　　\*　　\*　　\*　　\*

k. The owner or manager of the business is of a questionable character.

\*　　\*　　\*　　\*　　\*　　\*

s. The employer is an establishment whose primary purpose is the sale and on-premise consumption of alcoholic beverages, including the surrounding parking areas of such employer. This prohibition does not apply to establishments such as restaurants, hotels and motels that serve alcohol but whose primary source of income is from something else.

Exception:

Extra-employment is permitted at establishments whose primary purpose is the sale and on-premises consumption of alcoholic beverages when at least two uniformed officers are working simultaneously at the establishment and the establishment is within the city limits of Houston.

\*　　\*　　\*　　\*　　\*　　\*

## RESTRICTIONS

The following restrictions apply to extra-employment jobs:

a. No officer will be allowed to work any job which the Personnel Division has determined is not in the best interest of the Police Department and would bring ridicule or unfavorable publicity to the Police Department.

Fyfe attempts to forge a causal link between the City's policy of secondary employment and Holland's death through various opinions set forth in his report, affidavit, and deposition testimony. Specifically, Fyfe opines in his affidavit that the City caused Holland's death by allowing its officers to work as security guards at the Cue Club:

It is my opinion to a high degree of professional certainty that the City of Houston's policy allowing officers to work off-duty as armed and uniformed security guards in places such as Honey's Cue Club and Disco was a gross violation of generally accepted police custom and practice and a direct and proximate cause of the death of Morse Wayne Holland.

It is my opinion to a high degree of professional certainty that the wrongful death of Morse Wayne Holland was an extremely predictable result of the City of Houston's policy allowing officers to work off-duty as armed and uniformed security guards in places such as Honey's Cue Club and Disco. In such places in a large city like Houston, altercations and confrontations of the type that preceded Mr. Holland's death are virtually inevitable, and the failure to anticipate and prepare for them is nothing less than wilfully indifferent.

In his report, Fyfe states:

In short, any reasonable and competent police administrator would have regarded Honey's Cue Club and Disco as a

dive and trouble spot, and would have prohibited officers from using their uniforms, badges, and guns to protect its interest. If the Houston Police Department had done so, Officer Boling simply would not have been there to shoot and kill Mr. Holland.

These assertions, however, do not address the constitutionality of the City's secondary employment policy, either as written or as applied, but instead focus on "generally accepted police custom and practice" and what a "reasonable and competent police administrator" would do under the policy. Fyfe's analysis of the City's policy implies the utilization of a negligence standard, which is inapplicable to cases brought under § 1983. *See Farmer,* 511 U.S. at 828–29, 114 S.Ct. 1970; *Davidson,* 474 U.S. at 348, 106 S.Ct. 668; *Daniels,* 474 U.S. at 328, 106 S.Ct. 662; *Gamble,* 429 U.S. at 105, 97 S.Ct. 285; *Campbell,* 43 F.3d at 977; *Fraire,* 957 F.2d at 1276. "[A] negligent departure from established police procedure does not necessarily signal violation of constitutional protections." *Fraire,* 957 F.2d at 1276.

As noted above, the prove a direct causal link between an alleged constitutional deprivation and a municipal policy, not unconstitutional on its face, the plaintiffs must show that "the city consciously enacted a policy reflecting 'deliberate indifference' to the rights of its citizens." *Snyder,* 142 F.3d at 795–96 (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197). In this situation, it cannot be said that the City's secondary employment policy reflects deliberate indifference to the rights of its citizens. Indeed, the rights of the citizens of Houston appear to be enhanced by having certified peace officers, rather than untrained bouncers of questionable background, "at a dive and trouble spot," as Fyfe describes the Cue Club, to quell any disturbances before they get out of control and impinge on the rights of law-abiding citizens. Furthermore, Fyfe's testimony concerning generally accepted police custom and practice and proffer of certain

model policies have no bearing on whether Boling acted within the ambits of the Constitution. *See Soller v. Moore,* 84 F.3d 964, 968 (7th Cir.1996). "[W]hether it is wise public policy to allow off-duty officers to [work at establishments selling alcoholic beverages] is beside the point; the action is not unconstitutional and, more to the point, it has nothing to do with the key issue of whether the force used ... is excessive under the circumstances." *Id.* at 969. Evidence that a municipality's policies or practices fall short of national standards does not necessarily establish a violation of § 1983. *See Snyder,* 142 F.3d at 797 n. 5. The courts have been reluctant to hold the application of specific standards or practices to be constitutionally mandated. *See Brown,* 117 S.Ct. at 1394; *Snyder,* 142 F.3d at 797; *Stokes v. Bullins,* 844 F.2d 269, 275 (5th Cir.1988).

The plaintiffs also have not adduced sufficient evidence to establish that a policy or custom of the City was the "moving force" behind the alleged constitutional violation. *See Brown,* 117 S.Ct. at 1388; *Snyder,* 142 F.3d at 795 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). The focus must be on the direct and foreseeable effects of the policy or custom, not merely a "but for" notion of causation. *See Fraire,* 957 F.2d at 1281(citing *City of Canton,* 489 U.S. at 386, 109 S.Ct. 1197; *Tuttle,* 471 U.S. at 823, 105 S.Ct. 2427); *see also Huffman,* 147 F.3d at 1059–60 (finding no causal relationship between a county policy, criticized by Fyfe, requiring officers to carry guns at all times while off duty and the fatal shooting of a bar patron by an intoxicated sheriff's deputy). It is obvious that Boling would not have had an opportunity to shoot Holland if he had not been working at the Cue Club on August 7, 1994. It is also apparent that the City's secondary employment policy allowed Boling to work at the Cue Club. By the same token, however, it could be argued that Holland would not have been killed if Boling had not been hired by the City as a police officer or if the City did not have a policy requiring its police officers to carry

firearms. Yet, these hypotheticals, like the plaintiffs' contentions, are too attenuated to impose liability on the City for Holland's death. As the Supreme Court pointed out in *Tuttle:*

> [S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, [Boling] would never have killed [Holland] if [the City] did not have a 'policy' of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.' At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.

471 U.S. at 823, 105 S.Ct. 2427. Indeed, "[i]n the broadest sense, every injury is traceable to a hiring decision." *Brown,* 117 S.Ct. at 1394. As in *Brown,* however, the plaintiffs in this case have not demonstrated that a municipal policy or decision "reflects a conscious disregard for a high risk that [Boling or other HPD officers with extra-duty jobs in bars] would use excessive force in violation of [Holland's or other bar patrons'] federally protected rights." *Id.* In essence, the plaintiffs have failed to establish the requisite causal relationship between the City's extra-employment policy and Holland's death.

### b. *Inadequate Training and Vesting of Discretion*

The plaintiffs further assert that Holland suffered injury as a result of the City's "adopting inadequate training methods and techniques that grant officers utmost discretion in the discharge of their duties as police officers, including the use

of deadly force." The plaintiffs also contend that the City's policies that vest discretion in individual officers caused Holland's death because Boling improperly: pushed the fighting patrons from the Cue Club to the parking lot; failed to verbally identify himself as a police officer; and failed to call for police backup.

It is well established that the "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197; *see Snyder,* 142 F.3d at 796; *Evans v. City of Marlin,* 986 F.2d 104, 107 (5th Cir. 1993); *Burns v. City of Galveston,* 905 F.2d 100, 103 (5th Cir.1990); *Rodriguez,* 871 F.2d at 555; *Languirand,* 717 F.2d at 226–27. In order to hold a municipality liable under § 1983 for the acts of its employees under a theory of inadequate training or hiring, the plaintiff must show:

> (1) the training or hiring procedures of the municipality's policymaker were inadequate;
> (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and
> (3) the inadequate hiring or training policy directly caused the plaintiff's injury.

*Baker,* 75 F.3d at 200 (citing *City of Canton,* 489 U.S. at 385–87, 109 S.Ct. 1197); *see Snyder,* 142 F.3d at 798; *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir.), *cert. denied,* 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). A municipal "policy" must be a deliberate and conscious choice by a municipality's policymaker. *See Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992) (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197). To serve as the basis for § 1983 liability, the failure to promulgate municipal policy must amount to "an intentional choice, not merely an unintentionally negligent oversight." *See Evans,* 986 F.2d at 108 (quoting *Rhyne,* 973 F.2d at 392 (citing

*City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197)). "It is ... difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *Tuttle,* 471 U.S. at 823, 105 S.Ct. 2427. Where the alleged policy is one of inadequate training, municipal liability can be imposed only if the failure to train satisfies the deliberate indifference standard. *See Baker,* 75 F.3d at 200; *Benavides,* 955 F.2d at 972. The failure to adopt a policy rises to the level of indifference " 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.' " *Evans,* 986 F.2d at 108 (quoting *Rhyne,* 973 F.2d at 392). A municipality acts with deliberate indifference when:

> 'in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need .'

*Benavides,* 955 F.2d at 972 (quoting *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197). "A showing of negligence or even heightened negligence will not suffice." *Brown,* 117 S.Ct. at 1390.

Moreover, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197. The link cannot be merely indirect. A deficiency in training or supervision must be "closely related to the ultimate injury" for the governmental entity to be liable. *D.T. v. Independent Sch. Dist. No. 16,* 894 F.2d 1176, 1188 (10th Cir.), *cert. denied,* 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990). For governmental liability to attach, the lack of proper training, rather than "factors peculiar to the officer

involved in a particular incident," must be the "moving force behind the plaintiff's injury." *Brown,* 117 S.Ct. at 1390.

Liability may be imposed for "a deficient training 'program,' necessarily intended to apply over time to multiple employees." *Id.* (citing *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197). Generally, there must be considerably more proof than a single instance of injury or an isolated case of a poorly trained employee before municipal liability attaches in a case in which the plaintiff alleges a policy of failure to train employees adequately. *See Tuttle,* 471 U.S. at 824, 105 S.Ct. 2427; *Snyder,* 142 F.3d at 798; *Rodriguez,* 871 F.2d at 554–55. "The plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured ... to establish the official policy requisite to municipal liability under section 1983.' " *Snyder,* 142 F.3d at 798 (quoting *Rodriguez,* 871 F.2d at 554–55). "Basing liability on inadequate training where there is no municipal awareness of or acquiescence in a pattern of constitutional violations would potentially transform almost any encounter resulting in an injury into a valid § 1983 claim." *Kellough,* 22 F.Supp.2d at 611 (citing *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197).

Moreover,

> that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mis-

takes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197 (citations omitted); *see Snyder,* 142 F.3d at 798. "An adequate training program must 'enable officers to respond properly to the usual and recurring situations with which they must deal.'" *Benavides,* 955 F.2d at 972 (quoting *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197). Some courts have held that all that is required for a municipality to prevail on a claim based on inadequate training is compliance with state-mandated training standards for its officers. *See Huong,* 961 F.Supp. at 1007. In any event, a city's custom or policy authorizing or encouraging police misconduct "cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality." *Fraire,* 957 F.2d at 1278–79.

█ The plaintiffs contend that the City's training methods and policies giving HPD officers discretion to decide whether to effect an arrest, call for police backup, or identify oneself as a police officer are inadequate. To support their claims, the plaintiffs rely on the opinions of Fyfe. In his report, Fyfe concludes:

Officers Boling and Dunning committed a gross violation of generally accepted police custom and practice when they simply pushed the fight involving Mr. Holland out of Honey's Cue Club and Disco and onto the street. This violation was a direct and proximate cause of the unjustifiable and unnecessary death of Mr. Holland.

\* \* \* \* \* \*

Officers Boling and Dunning committed a gross violation of generally accepted police custom and practice when they failed to call on-duty officers to break up the second large fight that began outside the club, after they had ordered the combatants to go there. This violation was a direct and proximate cause of the

unjustifiable and unnecessary death of Mr. Holland.

\* \* \* \* \* \*

Officer Boling committed a gross violation of generally accepted police custom and practice when he failed to identify himself as a police officer before shooting Mr. Holland. This violation was a direct and proximate cause of the unjustifiable and unnecessary death of Mr. Holland.

In his affidavit, Fyfe states:

It is my opinion to a high degree of professional certainty that the City of Houston's policy that fails to require officers to verbally identify themselves whenever feasible and regardless of whether they wear uniforms and regardless of prevailing lighting conditions was a gross violation of generally accepted police custom and practice and a direct and proximate cause of the death of Morse Wayne Holland. This was an emotional, fast-breaking, and life-threatening situation involving people who had just been in a bar. In such circumstances, a verbal identification by police is imperative before any shooting could be considered reasonable and necessary.

\* \* \* \* \* \*

It is my opinion to a high degree of professional certainty that the City of Houston's policy that gives off-duty officers the discretion to refrain from calling for back-up assistance when they are trying to break up a fight in which they are outnumbered sometimes between five and two and fifteen to two was a gross violation of generally accepted police custom and practice and a direct, proximate, and predictable cause of the death of Morse Wayne Holland. The police know that the best deterrent to continued disordered resistance and best way to restore order where it has broken down is to obtain strength through numbers as quickly as possible.

Yet, like the expert's affidavit in *Baker:*

[Fyfe's] affidavit is more aspersion than evidence. It forms unsubstantiated con-

clusions regarding the defendants' role in creating purportedly outdated policy and providing inadequate manpower and supervision for controlling a crisis of the nature that erupted on the day of the shooting. 75 F.3d at 199. "[W]hen seeking to prove a municipality's malevolent motive, plaintiffs must introduce more evidence than merely the opinion of an expert witness." *Snyder,* 142 F.3d at 799. "[A]n expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards." *Snyder,* 142 F.3d at 799 (quoting *Stokes,* 844 F.2d at 275).

In response to Fyfe's opinions, the City tendered the affidavit of Terry Bratton ("Bratton"), an instructor employed at the HPD Training Academy for seventeen years and a witness designated by the City as an expert in the field of law enforcement, who explains the HPD's training regarding officer identification:

> The Houston Police Department trains its officers to identify themselves verbally in situations similar to the one involving Morse Wayne Holland on August 7, 1994. We instruct police officers to verbally identify themselves as police officers when dealing with citizens. We also instruct them that in the event an officer reasonably believes his purpose and identification are already known by, or cannot reasonably be made known to the person being addressed, they are not required to verbally identify themselves. When confronting individuals who are holding a weapon such as a shotgun, officers are trained to give verbal commands in an attempt to gain control while maintaining a tactical advantage.

Bratton confirmed that the HPD's identification training allows for officer discretion, and, in this instance, it was apparent that Boling was a police officer. The record reveals that immediately prior to the shooting, Boling was positioned in a well-illuminated area, dressed in a regulation HPD blue uniform, with a badge, HPD insignia, a gun belt and holster, and a gun, not the typical attire, no doubt, for patrons of the Cue Club.

The HPD's general policy for effecting an arrest, as set forth in General Order No. 500–1, also permits the exercise of officer discretion:

### GENERAL CONSIDERATIONS

> When effecting an arrest, officers will use only that amount of force necessary to effect an arrest to protect themselves or others. The arresting officer assumes primary responsibility for the health, safety and welfare of his prisoner.

In addition, the affidavit of Joe Breshears ("Breshears"), Assistant Chief of Police for the HPD and a witness designated by the City as an expert in the field of law enforcement, explains that HPD officers are trained to use their discretion when deciding whether backup assistance is necessary to effect an arrest. Breshears states that "officers utilize their discretion, based on their training and experience, in deciding if back up from on-duty patrol units is necessary. On-duty patrol units must be called to transport prisoners if an arrest is made."

In this situation, there is insufficient evidence that the City displayed deliberate indifference to the constitutional rights of its citizens when it adopted the training methods and other policies criticized by Fyfe. There is no evidence of a pattern or practice of constitutional violations committed by inadequately trained HPD officers working off-duty jobs at establishments selling alcoholic beverages. There is also no evidence that the City was aware of any problems arising from the training of off-duty police officers employed at such businesses or knew that the training of such officers was likely to endanger the constitutional rights of its citizens. "In short, the totality of the evidence does not even approach the *City of Canton* stan-

dard: that the inadequacy be 'so obvious' and 'so likely to result in the violation of constitutional rights,' ... that the city can be said to have been deliberately indifferent." *Snyder,* 142 F.3d at 799. "[T]he City's failure to provide further training in this circumstance would rise to the level of deliberate indifference only if it was aware of a series of constitutional violations occurring while its police officers were performing off-duty security work." *Robles v. City of Fort Wayne,* 113 F.3d 732, 736 (7th Cir.1997). It is undisputed, however, that no similar incidents involving off-duty HPD officers had been reported to the City.

■ Proof of "moving force" causation is also absent. The mere fact that a municipal policy allows for officer discretion is insufficient to establish liability under § 1983. "Discretionary decisions made by an official who is constrained by policies not of that official's making do not bind the municipality." *Fisher v. City of Cincinnati,* 753 F.Supp. 681, 689 (S.D.Ohio 1990) (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915). "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. 915. Here, the evidence does not establish even a remote link between the HPD's training policy or the vesting of discretion in individual officers and Holland's death, "so it [falls] far short of meeting the 'rigorous' and 'stringent' causation requirements demanded in *Bryan County*." *Snyder,* 142 F.3d at 799. In fact, a specific showing that Boling was improperly trained, which has not been established, is inadequate to impose liability on the City. *See id.* at 798; *see also Languirand,* 717 F.2d at 227–28 (although a police officer inadequately trained in the use of weapons shot at the plaintiff's car, the city was not liable under § 1983 because there was no pattern of similar incidents). "[I]n the absence of evidence at least of a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force," municipal liability will not be imposed. *Id.* The plaintiffs have produced no evidence to support the theory that the HPD's training program and vesting of discretion in individual officers "engenders unconstitutional behavior by officers performing off-duty security work." *Robles,* 113 F.3d at 736. "Indeed, there is no evidence other than the single incident alleged here of a City police officer committing a constitutional violation while performing off-duty security work," which is insufficient as a matter of law to impose municipal liability under § 1983. *Id.*

Therefore, because the plaintiffs have failed to demonstrate a constitutionally infirm municipal policy or custom that proximately caused Holland's death, the City is entitled to summary judgment on the plaintiffs' § 1983 claim.

## C. State Law Claims

### 1. Claim Against the City

In their amended complaint, the plaintiffs seek to impose vicarious liability on the City for Boling's alleged acts of negligence:

1. By failing to respond as a prudent officer would have under the same or similar circumstances.

2. By failing to deescalate or contain the fight between Decedent and other patrons of the club.

3. By allowing the fight to continue outside of the club on the parking lot premises.

4. By failing to recognized that the Decedent had disarmed himself or was never armed and was not a threat to the officer or anyone else on the premises.

5. By discharging his service revolver when Decedent was unarmed.

6. By discharging his service revolver in such a manner as to kill Decedent.

7. By using deadly force when Decedent was unarmed and did not present an equal threat of harm or bodily injury to him.

■ In Texas, under the doctrine of sovereign immunity, a governmental entity cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex.1998); *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex.), *cert. denied*, — U.S. —, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Harris County v. Dillard*, 883 S.W.2d 166, 168 (Tex.1994); *University of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex.1994); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976); *Harrison v. Texas Bd. of Pardons & Paroles*, 895 S.W.2d 807, 809 (Tex. App.—Texarkana 1995, writ denied); *Bookman v. Bolt*, 881 S.W.2d 771, 774 (Tex.App.—Dallas 1994, writ denied). Sovereign immunity can be waived only through the use of clear and unambiguous language. *See York*, 871 S.W.2d at 177; *Duhart v. State*, 610 S.W.2d 740, 742 (Tex. 1980). In the absence of a waiver, the City is entitled to sovereign immunity with respect to the plaintiffs' claims. *See York*, 871 S.W.2d at 177; *City of El Paso v. W.E.B. Investments*, 950 S.W.2d 166, 169 (Tex.App.—El Paso 1997, writ denied); *Allen v. City of Midlothian*, 927 S.W.2d 316, 322 (Tex.App.—Waco 1996, no writ).

■ The Texas Legislature enacted the Texas Tort Claims Act ("TTCA") to waive sovereign immunity in certain limited circumstances. *See Bossley*, 968 S.W.2d at 340, 343; *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 586 (Tex.1996); *York*, 871 S.W.2d at 177; *Harrison*, 895 S.W.2d at 809. The TTCA provides:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by the condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. Cities, as political subdivisions of the State of Texas, come within the parameters of the Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(B); *see also Vela v. City of McAllen*, 894 S.W.2d 836, 839 (Tex. App.—Corpus Christi 1995, no writ); *City of San Antonio v. Winkenhower*, 875 S.W.2d 388, 392 (Tex.App.—San Antonio 1994, writ denied); *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 45 (Tex.App.1993, no writ). For a governmental entity to be held liable for the acts of its employee under the TTCA: (1) the claim must arise under one of three specific areas of liability; and (2) the claim must not fall within an exception to the waiver of sovereign immunity. *See Alvarado v. City of Brownsville*, 865 S.W.2d 148, 155 (Tex.App.—Corpus Christi 1993), *rev'd on other grounds*, 897 S.W.2d 750 (Tex.1995); *accord City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex.App.—Houston [1st Dist.] 1995, no writ); *McKinney v. City of Gainesville*, 814 S.W.2d 862, 865 (Tex. App.—Fort Worth 1991, no writ); *see also City of Denton v. Page*, 701 S.W.2d 831, 834 (Tex.1986); *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 31 (Tex.1983). "The determination of a governmental entity's negligence will be made only after a claimant has cleared these two statutory hurdles." *Alvarado*, 865 S.W.2d at 155.

■ In order to hold the City liable under the TTCA, the plaintiff's injuries

must have been proximately caused by the operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or personal property. *See Bossley,* 968 S.W.2d at 342–43; *Salcedo,* 659 S.W.2d at 33; *Vincent v. West Tex. State Univ.,* 895 S.W.2d 469, 472 (Tex.App.—Amarillo 1995, no writ); TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. Tangible property is property that is capable of being handled, touched, or seen. *See York,* 871 S.W.2d at 178; *Harrison,* 895 S.W.2d at 809; *Vincent,* 895 S.W.2d at 472; *Birdo v. Williams,* 859 S.W.2d 571, 573 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Jefferson County v. Sterk,* 830 S.W.2d 260, 262 (Tex.App.—Beaumont 1992, writ denied). To state a claim under the TTCA based on the use or misuse of nondefective personal property, a plaintiff must allege (1) that the property was used or misused by a governmental employee acting within the scope of his or her employment and (2) that the use or misuse of the property was a contributing factor to the injury. *See Smith v. Tarrant County,* 946 S.W.2d 496, 501 (Tex.App.—Fort Worth 1997, writ denied) (citing *Salcedo,* 659 S.W.2d at 32).

■ The negligence of the government employee must be the proximate cause of the injury and must involve a condition or use of tangible personal property under circumstances where there would be private liability. *See Salcedo,* 659 S.W.2d at 32; *Smith,* 946 S.W.2d at 501; *see also York,* 871 S.W.2d at 178 n. 5. The property itself need not be the instrumentality of the alleged harm, but it must have been a contributing factor to the harm. *See Salcedo,* 659 S.W.2d at 32; *Smith,* 946 S.W.2d at 501. The requirement of causation mandates more than mere involvement of property, although exactly how much more has not been clearly defined by the Texas courts. *See Bossley,* 968 S.W.2d at 343. "Property does not cause injury if it does no more than furnish the condition that makes the injury possible." *Id.* (citing

*Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995)).

■ In addition, the TTCA does not provide for liability based upon a misuse of information, even if that information is recorded in writing, as information is not tangible property. *See York,* 871 S.W.2d at 179; *Texas Department of Human Servs. v. Benson,* 893 S.W.2d 236, 239–40 (Tex.App.—Austin 1995, writ denied). "[I]nformation itself is an abstract concept, lacking corporeal, physical, or palpable qualities." *York,* 871 S.W.2d at 179. Likewise, misinterpreting or drawing the wrong conclusion from information does not involve tangible personal property under the TTCA. *See Campbell,* 43 F.3d at 979. Similarly, claims involving a nonuse of property are not actionable under the TTCA. *See Kassen,* 887 S.W.2d at 14; *Smith,* 946 S.W.2d at 501. Hence, because no tangible property is involved, claims "asserting a failure to identify [the plaintiff's] medical condition, a failure to render proper medical care, a failure to train, control and supervise, and improper police procedures are not waived by the TTCA; therefore, these negligence allegations are barred by sovereign immunity." *Riggs v. City of Pearland,* 177 F.R.D. 395, 406 (S.D.Tex.1997) (citing *Texas Dep't of Corrections v. Herring,* 513 S.W.2d 6, 9 (Tex. 1974)); *see City of Orange v. Jackson,* 927 S.W.2d 784, 786 (Tex.App.—Beaumont 1996, no writ). There is also no cognizable cause of action for "merely negligent misidentification." *Campbell,* 43 F.3d at 979. Furthermore, to recover under the TTCA, the injury for which recovery is sought must be more than *de minimis. See Thomas v. Texas Department of Crim. Justice,* 848 S.W.2d 797, 798–99 (Tex. App.—Houston [14th Dist.] 1993, writ denied).

■ Under the TTCA, unlike in a federal § 1983 action, a governmental unit may be liable for its employee's negligence under the doctrine of *respondeat superior. See DeWitt,* 904 S.W.2d at 653. "*Respondeat superior* imposes liability on the em-

ployer that is responsible for the acts of his employee, acting in the scope of his employment, where the negligence of the employee is shown to have been the proximate cause of [the] injury." *Id.* at 654 (citing *Marange v. Marshall,* 402 S.W.2d 236, 239 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.)). Nevertheless, as with a private employer, affirmative defenses available to its employees are also available to the City. *See id.; see also City of Columbus v. Barnstone,* 921 S.W.2d 268, 272 (Tex.App.—Houston [1st Dist.] 1995, no writ). Thus, liability cannot be imposed upon a governmental entity for the negligence of an employee who has official immunity. *See DeWitt,* 904 S.W.2d at 651; *Guevara,* 911 S.W.2d at 903; *Perez,* 905 S.W.2d at 698. Furthermore, an employee may have official immunity even though he may have been negligent in the performance of his duties. *See Guevara,* 911 S.W.2d at 904.

▪ Here, the plaintiffs' first four claims of negligence against Boling do not involve the operation or use of a motor vehicle or the condition or use of tangible personal or real property. Therefore, they do not fall with the scope of the TTCA, and the City is immune from liability. Similarly, because no tangible property is involved, the plaintiffs' claims against the City asserting improper training and faulty police procedure are barred by sovereign immunity, because they are not cognizable under the TTCA, and the City's immunity is not waived as to those claims.

With respect to the last three claims asserted against Boling, the plaintiffs contend that Holland's injuries were caused by Boling's negligent use of tangible personal property—his service revolver. It is undisputed that the gun is tangible personal property. *See Smith,* 946 S.W.2d at 501. There is also adequate evidence in the record that Boling's use of the gun caused Holland's death. Yet, "[r]egardless of the language used, it is clear that Plaintiffs' claims consist of intentional torts." *Huong,* 961 F.Supp. at 1008 (citing *Little*

*v. Schafer,* 319 F.Supp. 190, 192 (S.D.Tex. 1970); *City of San Antonio v. Dunn,* 796 S.W.2d 258, 261 (Tex.App.—San Antonio 1990, writ denied)).

▪ The TTCA does not waive immunity for intentional torts. *See Taylor v. Gregg,* 36 F.3d 453, 457 (5th Cir.1994); *Riggs v. City of Pearland,* 177 F.R.D. 395, 405 (S.D.Tex.1997); *Huong v. City of Port Arthur,* 961 F.Supp. 1003, 1008–09 (E.D.Tex.1997); *Kmiec,* 902 S.W.2d at 122; *Dunn,* 796 S.W.2d at 261. In fact, intentional torts are specifically exempted from the coverage of the TTCA. The statute provides:

> This chapter does not apply to a claim:
>
> (1) based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or
>
> (2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.057. "This limitation provides that claims 'arising out of assault, battery, false imprisonment, or any other intentional tort' are not actionable" under the TTCA. *McCord,* 750 S.W.2d at 363 (use of nightstick by security guard during intentional tort not actionable); *see Riggs,* 177 F.R.D. at 405 (use of mace by police officer to subdue person engaging in bizarre behavior not actionable); *Callis v. Sellars,* 953 F.Supp. 793, 801 (S.D.Tex.1996) (sexual abuse and harassment by police officer not actionable); *Dunn,* 796 S.W.2d at 261 (application of handcuffs too tightly during course of alleged false arrest not actionable). "This provision shields municipalities from suits arising out of intentional torts committed by governmental employees and should be liberally construed to accomplish this objective." *Gillum v. City of Kerrville,* 3 F.3d 117, 123 (5th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994) (citations omitted).

■ Where the essence of a claim under the TTCA arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability. *See Callis,* 953 F.Supp. at 801; *Little v. Schafer,* 319 F.Supp. 190, 192 (S.D.Tex.1970); *see also Dunn,* 796 S.W.2d at 261; *McCord,* 750 S.W.2d at 363. "While it was pleaded in the complaint that the [defendant] negligently and without exercising reasonably prudent care shot and killed the deceased, the cause of action which [the plaintiff] sought to plead was one for wrongful assault and battery resulting in the death of the deceased." *Alaniz v. United States,* 257 F.2d 108, 110–11 (10th Cir.1958). Here, the tort about which the plaintiffs complain is, in essence, assault and battery, and their allegations of negligence are not sufficient to avoid the intentional torts exception to the TTCA. *See United States v. Faneca,* 332 F.2d 872, 875 (5th Cir.1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965). As Judge Kent of this court observed in a similar case:

Although Plaintiff uses the term "negligent" in describing her claims under this cause of action, the events described as negligent form the basis for her § 1983 claim as well. Plaintiff's § 1983 cause of action and her claims under the Texas Tort Claims Act are mutually exclusive. A plaintiff cannot pursue pendent state claims under the Texas Tort Claims Act where they are based on a single event, an event alleged under a contemporaneous § 1983 cause of action to be an intentional tort. *See, e.g., Taylor v. Gregg,* 36 F.3d 453, 457 (5th Cir.1994).

*Drain v. Galveston County,* 979 F.Supp. 1101, 1104–05 (S.D.Tex.1997). "Artful pleadings of facts cannot bring excluded claims within sovereign immunity waiver." *Gonzales v. Bexar County,* No. 04–97–00679–CV, 1998 WL 274297, at *3 (Tex. App.—San Antonio May 29, 1998, n.w.h.) (citing *Townsend v. Memorial Med. Ctr.,* 529 S.W.2d 264, 267 (Tex.App.—Corpus Christi, writ ref'd n.r.e)). "Under Plaintiff's version of the facts, there is no suggestion that [Boling's] conduct was in any way merely 'negligent.'" *Callis,* 953 F.Supp. at 801.

In their amended complaint, the plaintiffs describe the incident:

Officer Boling saw Decedent with a shotgun and ordered Decedent to drop it. Decedent either complied with Boling's command and disarmed himself or he never had the gun. Notwithstanding Decedent being unarmed himself, Officer Boling fired his service revolver at least eleven times hitting Decedent 3 times in the abdomen, back and right arm.

In the plaintiffs' responses to the defendants' motions for summary judgment, they further elaborate:

Officer David Boling, one of the off duty Houston Police Officers, was alerted that someone had a gun in the parking lot and he began trying to locate the person. Officer Boling spotted Holland running towards the car, followed him and without identifying himself yelled a command to Holland. Officer Boling paused after the command and shot Holland several times, killing him at the scene.

In their response to the City's motion, the plaintiffs also state, "It is undisputed that Officer Boling aimed, fired and shot Wayne Morse Holland with his service revolver on August 7, 1994."

Under the circumstances described, Boling's use of force was deliberate and intentional, not merely negligent. There is no allegation and no evidence in the record that Boling did not intend to shoot Holland. There is also no indication, and the plaintiffs do not contend, that the gun misfired or discharged inadvertently. The plaintiffs' contention that it is disputed "whether Officer Boling fully appreciated the circumstances that night and whether he negligently acted under those circumstances by firing and shooting an unarmed person" does not suffice to avoid immunity. These are allegations of misinterpretation

or misperception of information, which do not involve tangible personal property and, thus, are not actionable under the TTCA. *See Campbell,* 43 F.3d at 979.

The plaintiffs cannot now plead that Boling was simply negligent in order to support state law claims under the TTCA. *See Drain,* 979 F.Supp. at 1105. The plaintiffs do not allege that Holland's death arose from an independent act of negligence on the part of the City or another employee of the City for which immunity is waived. *See Downey v. Denton County,* 119 F.3d 381, 387–88 (5th Cir.1997); *Delaney v. University of Houston,* 835 S.W.2d 56, 59 (Tex.1992). "[T]he prevailing case law on this issue mandates that Plaintiffs cannot circumvent the intentional tort exception to waiver of municipal liability by simply pleading negligence when the shooting event upon which they base their claims is actually an intentional tort." *Huong,* 961 F.Supp. at 1009. Thus, although ostensibly couched as negligence claims, the plaintiffs' claims against the City focusing on Boling's "discharging his revolver" and "using deadly force" against Holland are in essence intentional tort claims, and are barred against the City under the doctrine of sovereign immunity.

The TTCA also contains exemptions to the waiver of sovereign immunity "to avoid a judicial review that would question the wisdom of a government's exercise of its discretion in making policy decisions." *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 754 (Tex.1995); *see State v. Terrell,* 588 S.W.2d 784, 787 (Tex. 1979). Thus, the TTCA excludes claims that arise "from the failure to provide or the method of providing police or fire protection." TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(3); *see Huong,* 961 F.Supp. at 1008; *Barefield v. City of Houston,* 846 S.W.2d 399, 405–06 (Tex.App.—Houston [14th Dist.] 1992, writ denied). "It is well established that there can be no municipal liability for a government entity's decision for providing police protection." *Gonzales v. City of El Paso,* 978 S.W.2d 619, 621

(Tex.App.—El Paso 1998, n.w.h.); *see Alvarado,* 897 S.W.2d at 754; *Terrell,* 588 S.W.2d at 788. There is a distinction, however, between the formulation of policy and the implementation of policy. The exemption in § 101.055(3) applies only to claims arising from the negligent formulation of policy; it does not exempt claims arising from the negligent implementation of policy. *See Alvarado,* 897 S.W.2d at 754; *Terrell,* 588 S.W.2d at 787–88; *Gonzales,* 978 S.W.2d at 622. "Thus, if the negligence causing an injury lies in the formulating of policy—*i.e.,* the determining of the method of police protection to provide—the government remains immune from liability. If, however, an officer or employee acts negligently in carrying out that policy, government liability may exist under the Act." *Alvarado,* 897 S.W.2d at 754.

Another exception to liability includes a claim that is based on "the failure of a governmental unit to perform an act that the unit is not required by law to perform" or one that is based on "a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit." TEX. CIV. PRAC. & REM. CODE ANN. § 101.056. The same distinction between the formulation and implementation of policy applies with respect to the discretionary acts exemption. *See Alvarado,* 897 S.W.2d at 754; *Terrell,* 588 S.W.2d at 787. Hence, because "failure to train and formulation or implementation of policy both relate to the City's method of providing police protection and constitute discretionary acts, such claims fall within this exception to waiver of liability under the Texas Tort Claims Act." *Huong,* 961 F.Supp. at 1009; *see Barefield,* 846 S.W.2d at 405–06. Thus, the plaintiffs' claims attacking the City's "deliberate conduct in enacting certain official policies of the Houston Police Department" do not fall within the scope of the TTCA, as they

involve intentional conduct, do not entail the use of a motor vehicle or tangible property, and are exempted from coverage under both the police protection and discretionary acts exemptions. Therefore, the City has immunity from these claims under the Texas sovereign immunity doctrine.

Accordingly, summary judgment is warranted on all the plaintiffs' state law claims asserted against the City.

### 2. *Claim Against Boling*

#### a. *Official Immunity*

■ Boling contends that the plaintiffs' claims against him are barred under Texas law by the doctrine of official immunity. Unlike sovereign immunity, which protects governmental entities, official immunity protects individual officials from liability. *See DeWitt v. Harris County,* 904 S.W.2d 650, 652 (Tex.1995); *Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex.1994). "Official immunity . . . exists so government officials may remain free to exercise their duties without fear of damage suits: suits which would consume their time and energy and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Jackson v. Stinnett,* 881 S.W.2d 498, 500 (Tex. App.—El Paso 1994, no writ); *see Armendarez v. Tarrant County Hosp. Dist.,* 781 S.W.2d 301, 305 (Tex.App.—Fort Worth 1989, writ denied). "The purpose of official immunity is to insulate the functioning of government from the harassment of litigation, not to protect erring officials." *Kassen,* 887 S.W.2d at 8 (citing *Westfall v. Erwin,* 484 U.S. 292, 295, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988)).

■ Under Texas law, "[g]overnment officials are entitled to immunity from suit arising from performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Hart,* 127 F.3d at 450 (citing *Chambers,* 883 S.W.2d at 653); *see Tamez,* 118 F.3d at 1097; *Cantu,* 77 F.3d at 808; *Kassen,* 887 S.W.2d

at 9; *Wyse v. Department of Pub. Safety,* 733 S.W.2d 224, 227 (Tex.App.—Waco 1986, writ ref'd n.r.e.); *Baker v. Story,* 621 S.W.2d 639, 644 (Tex.Civ.App.—San Antonio 1981, writ ref'd n.r.e.). Official immunity is an affirmative defense which places on the defendant the burden of establishing all of its elements. *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984).

■ An act is discretionary under Texas law if it requires personal deliberation, decision, and judgment. *See Harris County v. Ochoa,* 881 S.W.2d 884, 887 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *Esparza v. Diaz,* 802 S.W.2d 772, 779 (Tex.App.—Houston [14th Dist.] 1990, no writ). "Discretionary functions receive protection, but ministerial duties do not." *Kassen,* 887 S.W.2d at 9. As the Texas Supreme Court explained in *Chambers:*

> Ministerial acts are those '[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment . . . but where the act to be done involves the exercise of discretion or judgment, it is not to be deemed merely ministerial.' . . . If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial.

883 S.W.2d at 654 (citations omitted); *see Tamez,* 118 F.3d at 1097; *Kassen,* 887 S.W.2d at 9; *Baker,* 621 S.W.2d at 645. Texas courts have long recognized that police officers are engaged in discretionary functions while performing their official duties. *See, e.g., Tamez,* 118 F.3d at 1097; *Gallia v. Schreiber,* 907 S.W.2d 864, 869 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Texas Dep't of Pub. Safety v. Perez,* 905 S.W.2d 695, 699–700 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Boozier v. Hambrick,* 846 S.W.2d 593, 597 (Tex.

App.—Houston [1st Dist.] 1993, no writ); *Vasquez v. Hernandez*, 844 S.W.2d 802, 804–05 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.); *Wyse*, 733 S.W.2d at 227; *Dent v. City of Dallas*, 729 S.W.2d 114, 117 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988).

■ "An official acts in 'good faith' if any reasonably prudent officer could have believed that the conduct was consistent with the plaintiff's rights." *Cantu*, 77 F.3d at 808; *see Tamez*, 118 F.3d at 1097; *Chambers*, 883 S.W.2d at 656–57; *City of Beverly Hills v. Guevara*, 911 S.W.2d 901, 904–05 (Tex.App.—Waco 1995, no writ); *Perez*, 905 S.W.2d at 699. The test of good faith is one of objective legal reasonableness without regard to whether the government official involved acted with subjective good faith. *See Hart*, 127 F.3d at 450; *Cantu*, 77 F.3d at 809; *Chambers*, 883 S.W.2d at 656. To controvert an official's summary judgment proof of good faith, the plaintiff must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Chambers*, 883 S.W.2d at 657; *Guevara*, 911 S.W.2d at 904. If officers of reasonable competence could disagree on the issue, immunity should be recognized. *See Gallia*, 907 S.W.2d at 869 (citing *Chambers*, 883 S.W.2d at 656–57).

■ An official is acting within the scope of his authority for immunity purposes when discharging duties generally assigned to that official, even though the official may be acting unlawfully. *See Cantu*, 77 F.3d at 808; *Chambers*, 883 S.W.2d at 658. Hence, a police "officer acts within the scope of his authority if he discharges the duties generally assigned to him." *Tamez*, 118 F.3d at 1097.

■ Here, there is sufficient evidence that Boling was engaged in a discretionary act within the scope of his authority when Holland was killed. As discussed above, however, there is conflicting evidence as to whether a "reasonable official" in Boling's position could have believed his actions to be lawful. In Texas, "a peace officer is justified in using deadly force when the peace officer reasonably believes that the deadly force is necessary to make an arrest if (1) the officer reasonably believes the conduct for which the arrest is authorized included the use or attempted use of deadly force; or (2) the officer reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the officer or another if the arrest is delayed." *Wicker v. City of Galveston*, 944 F.Supp. 553, 560 (S.D.Tex.1996) (citing TEX. PEN. CODE ANN. § 9.51); *see Fraire*, 957 F.2d at 1276. Thus, if Holland was in fact unarmed, the use of deadly force would have been unreasonable, unless Boling reasonably believed him to be armed and to pose a danger to Boling or others. In the present circumstances, the existence of outstanding issues of material fact preclude a determination of the availability of official immunity, although Boling may be entitled to derivative immunity from the City.

### b. *Derivative Immunity*

■ While sovereign immunity protects Boling from a claim asserted against him in his official capacity, "[s]overeign immunity does not apply to suits against individuals." *Jackson*, 881 S.W.2d at 500 (citing *Thomas v. Collins*, 853 S.W.2d 53, 55 (Tex.App.—Corpus Christi 1993, writ denied)). Nevertheless, the TTCA "extends immunity to governmental employees." *Urban v. Canada*, 963 S.W.2d 805, 807 (Tex.App.—San Antonio 1998, n.w.h.). Under the TTCA, when an action against a governmental entity results in a judgment or is settled, an action against the employee whose act or omission gave rise to the claim is barred as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106; *Bossley*, 968 S.W.2d at 339, 341; *Newman v. Obersteller*, 960 S.W.2d 621, 622 (Tex. 1997); *Thomas v. Oldham*, 895 S.W.2d 352, 355 (Tex.1995); *White v. Annis*, 864

S.W.2d 127, 131 (Tex.App.—Dallas 1993, writ denied). The statute provides:

> A judgment in an action or a settlement of a claim under this chapter bars any action involving the same subject matter by the claimant against the employee of the governmental unit whose act or omission gave rise to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106. This provision bars the rendition of judgment against an employee subsequent to or concurrent with a rendition of judgment as to the governmental employer. *See Thomas*, 895 S.W.2d at 355; *White*, 864 S.W.2d at 132. It applies "if the settlement or judgment in the action against the governmental unit occurs at any time before or during the pendency of the 'action' against the employee." *Thomas*, 895 S.W.2d at 355.

Section 101.106 is an immunity statute and precludes claims against a governmental employee involving the same action, transaction, or occurrence without regard to whether the action against the employee is based on the same cause of action; the action need only involve the same subject matter as the action brought against the governmental entity. *See Bossley*, 968 S.W.2d at 343; *Newman*, 960 S.W.2d at 622; *Beasley v. Clark*, 986 S.W.2d 256 (Tex.App.—Houston [1st Dist.] 1998, n.w.h.); *Urban*, 963 S.W.2d at 807; *Bell v. Love*, 923 S.W.2d 229, 233 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Owens v. Medrano*, 915 S.W.2d 214, 216 (Tex.App.—Corpus Christi 1996, writ denied); *White*, 864 S.W.2d at 131. Thus, whether the plaintiffs' claim against the governmental unit falls under the TTCA is relevant, but whether the plaintiffs' claim against the employee falls under the TTCA is not. *See White*, 864 S.W.2d at 130; *see also Brand v. Savage*, 920 S.W.2d 672, 674 (Tex.App.—Houston [1st Dist.] 1995, no writ). The provision even applies to situations in which the employee is not acting within the scope of his employment or in good faith. *See Owens*, 915 S.W.2d at 216.

Most significantly, § 101.106 "bars an action against the employee whether the judgment was in favor of or against the employer and even when the judgment was not rendered on the merits." *Brand*, 920 S.W.2d at 674; *accord Gonzalez v. El Paso Hosp. Dist.*, 940 S.W.2d 793, 795 (Tex.App.—El Paso 1997, no writ); *see Bossley*, 968 S.W.2d at 622; *Newman*, 960 S.W.2d at 622; *Urban*, 963 S.W.2d at 807–08; *Owens*, 915 S.W.2d at 216; *Cox v. Klug*, 855 S.W.2d 276, 280 (Tex.App.—Amarillo 1993, no writ); *Davis v. Mathis*, 846 S.W.2d 84, 88–89 (Tex.App.—Dallas 1992, no writ). "Whether the outcome of the governmental liability claim is favorable or adverse to the plaintiff is not a distinction made by the statute . . . ." *Gonzalez*, 940 S.W.2d at 795. Hence, several cases have applied the bar to employee liability where judgment for the governmental unit was based on the plaintiff's failure to comply with the TTCA notice requirements, a defense that would not have protected an employee sued individually. *See id.; Cox*, 855 S.W.2d at 280; *Davis*, 846 S.W.2d at 88–89; TEX. CIV. PRAC. & REM. CODE ANN. § 101.101. Similarly, the provision forecloses a claim against an employee arising from an intentional tort, as intentional torts are specifically excluded by the TTCA, and governmental entities retain their sovereign immunity with respect to such claims. *See Brand*, 920 S.W.2d at 674; TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2). Thus, in *Brand*, the court found the plaintiff's claims against a police officer for malicious prosecution, false imprisonment, conversion, and assault and battery to be barred by summary judgments granted in favor of the municipalities that employed the officer. *See* 920 S.W.2d at 674–75.

In essence, § 101.106 provides "automatic derivative immunity for a governmental employee." *Davis*, 846 S.W.2d at 88. "An individual performing a governmental function can be charged with no greater responsibility than that imposed upon the governmental unit." *Id.* (citing

*Steele v. Barbian,* 620 S.W.2d 875, 878 (Tex.Civ.App.—Amarillo 1981, no writ)). "The purpose of § 101.106 is to protect government employees from individual liability for acts or omissions where a claim based upon the same facts is made against their employers under the [TTCA]." *Gonzalez,* 940 S.W.2d at 795. The courts have recognized that the effect of this statute may be harsh. *See Brand,* 920 S.W.2d at 675. Nevertheless, as the Texas Supreme Court noted in *Thomas:*

> Although a plaintiff who pursues the statutory remedy against the government may lose his or her common law remedy against the employee, the plaintiff is not required to follow this course. He or she may still opt to pursue the full common law remedy against the responsible employee, foregoing or postponing any attempt to recover from the government.

895 S.W.2d at 357–58; *see Bell,* 923 S.W.2d at 232; *Brand,* 920 S.W.2d at 675. In addition, as pointed out in *Brand,* state and federal constitutional claims are not barred by the statute. *See id.* at 675. The First Court of Appeals explained:

> For example, appellant could have circumvented the Tort Claims Act and its effects by bringing a claim for violation of her constitutionally protected rights under 42 U.S.C. § 1983. However, because she chose to bring her action pursuant to the Act, she is bound by its provisions and limitations, including section 101.106. *See State Dep't of Highways v. Dopyera,* 834 S.W.2d 50, 54 (Tex.1992). ("Once a plaintiff invokes the procedural devices of the Texas Tort Claims Act, to bring a cause of action against the State, then he is bound by the limitations and remedies provided in the statute.")

*Id.* Thus, in view of the summary judgment granted to the City on the plaintiffs' state law claims, Boling is, likewise, shielded from liability on those claims under § 101.106 of the TTCA.

Accordingly, summary judgment is proper with respect to the plaintiffs' state law claims against both the City and Boling.

### III. *Conclusion*

The plaintiffs have adduced no evidence upon which the City can be held liable for Holland's injuries. They have proffered no evidence that the City has a policy or custom that authorizes or condones the use of excessive force on the part of its officers, and they have failed to show the requisite causal link between other municipal policies and Holland's death. The City has sovereign immunity from the plaintiffs' Texas state law claims. Because there are no outstanding issues of material fact as to the plaintiffs' claims against the City, it is entitled to summary judgment with regard to all of the plaintiffs' claims arising under § 1983 and Texas state law.

Fact questions exist, however, as to the plaintiffs' claim of excessive force against Boling in his individual capacity. Fact questions are also presented as to whether Boling is entitled to qualified immunity on the excessive force claim. The plaintiffs' state law causes of action against Boling, however, are barred by derivative immunity stemming from the summary judgment granted in favor of the City on those claims.

Accordingly, the City's Motion for Summary Judgment is GRANTED.

Boling's Motion for Summary Judgment is GRANTED as to the plaintiffs' state law claims.

Boling's Motion for Summary Judgment is DENIED as to the plaintiffs' excessive force claim under § 1983, and that claim may proceed to trial.

IT IS SO ORDERED.